[Cite as *In re S.P.*, 2021-Ohio-25.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY


In re S.P., A.B., X.B.                                  Court of Appeals No. L-20-1127

                                                       Trial Court Nos. JC 19273033
                                                                        JC 19273548


                                                       **DECISION AND JUDGMENT**

                                                       Decided: January 8, 2021

* * * * *

Adam H. Houser, for appellant.

Jeremy G. Young, for appellee.

* * * * *

**PIETRYKOWSKI, J.**

{¶ 1} This is an appeal from the judgment of the Lucas County Court of Common

Pleas, Juvenile Division, which awarded permanent custody of the minor children, S.P.,

A.B., and X.B., to appellee, Lucas County Children Services ("LCCS"), thereby

terminating the parental rights of mother-appellant, C.F. For the reasons that follow, we

affirm.

## I. Facts and Procedural Background

{¶ 2} The present matter was initiated on February 15, 2019, when LCCS filed a complaint in dependency, abuse, and neglect pertaining to five of mother's children. R.B. is the father of the two older children, Ru.B. and Sh.B. Se.P. is the father of the middle child, S.P. S.B. is the father of the two younger children, A.B. and X.B. For purposes of this appeal, only the court's disposition regarding the three younger children, S.P., A.B., and X.B., is at issue.[1]

{¶ 3} The complaint alleged that S.B., the father of the two younger children, raped and sexually assaulted the second oldest child, Sh.B. The behavior was alleged to be ongoing until Sh.B. moved out of the house. Of particular note is that in June 2016, Sh.B. became pregnant with what was alleged to be S.B.'s child. The complaint alleged that mother was aware of S.B.'s behavior for over one and one-half years, but did nothing to stop the behavior or protect the children. Even after LCCS became involved with the family, mother would sneak S.B. into the home and hide him in a closet whenever someone came by.

{¶ 4} A shelter care hearing was then held at which the trial court awarded temporary custody of the children to LCCS.

{¶ 5} Thereafter, on May 14, 2019, M.W., the paternal grandmother of A.B. and X.B., filed a pro se motion for legal custody of those children. That motion was heard in

---

[1] LCCS ultimately was granted legal custody of mother's two older children, Ru.B. and Sh.B., to place them in a planned permanent living arrangement.

conjunction with the adjudication hearing held on June 26, 2019. Following the hearing, the trial court found that S.P., A.B., and X.B. were neglected and dependent. The trial court further found that M.W.'s motion for legal custody was not well-taken, and that legal custody to M.W. was not in the children's best interest due to issues of housing, potential sexual assault, and the extreme special needs of A.B.

{¶ 6} On November 20, 2019, M.W., through counsel, again filed a motion for legal custody of A.B. and X.B. On January 2, 2020, LCCS moved for permanent custody of S.P., A.B., and X.B.

{¶ 7} Both matters were heard on July 14, 2020. Notably, mother was not present at the hearing as she was incarcerated at the time. However, mother was represented by counsel at the hearing, and an objection was made regarding her absence.

{¶ 8} At the July 14, 2020 hearing, Latosha Duran testified as a witness for LCCS. Duran is a counselor for X.B., who is seven years old. Duran testified that X.B. has Reactive Attachment Disorder, which makes it difficult for him to attach with his caregivers, and manifests itself in anger, emotional outbursts, and lying. Duran explained that X.B. has had several different placements disrupted due to his behavior, which included setting a fire in a trashcan and breaking a television. Duran testified that X.B. has recently been placed in a therapeutic foster home, with the hope that the foster family will be more capable to address and help X.B. work through his behaviors.

{¶ 9} Another of X.B.'s counselors, Krista McCulloch, testified. McCulloch also testified that X.B. exhibited signs of Reactive Attachment Disorder. She explained that

3.

as X.B. becomes more attached to a caregiver, he acts out in an attempt to push the caregiver away. McCulloch agreed that X.B. needed a caregiver who understood the disorder and could work through the behaviors. McCulloch also testified that she believed that X.B.'s behaviors were caused by severe neglect in his biological home. X.B. revealed to McCulloch through play therapy that his father, S.B., would "beat on him," and that mother would not nurture or care for him in the way that he needed.

{¶ 10} In addition to counseling X.B., McCulloch also counseled S.P. and Sh.B. As to S.P., who was 11 years old, McCulloch testified that she has been diagnosed with Post Traumatic Stress Disorder and Reactive Attachment Disorder stemming from the severe physical and emotional abuse that she experienced. S.P. reported that her stepfather, S.B., has choked her, hit her, called her a whore and a slut, and threatened her. Recently, S.P. began to report that S.B. sexually abused her as well. McCulloch testified that through therapy, S.P. is making tremendous progress. McCulloch described S.P. as a wonderful girl, outgoing and expressive. Regarding potential placements for S.P., McCulloch testified that S.P. has been building a relationship with a cousin in Virginia. The cousin is a licensed foster parent, and has expressed a willingness to engage in further training and family therapy sessions to help S.P. address the issues she is facing. According to McCulloch, S.P. is extremely excited about the potential plan to move to Virginia to live with her cousin.

{¶ 11} McCulloch also testified as it relates to some concerns with M.W. McCulloch testified that while X.B. talks about M.W. frequently and in a positive way,

4.

the same could not be said for S.P. and Sh.B. S.P. and Sh.B. have both reported to McCulloch that M.W. was aware of the abuse that was occurring in the home by her son, S.B., but did nothing about it. Sh.B. reported that she was present during a time when mother talked in front of M.W. about the sexual abuse that was occurring in the home. Sh.B. also reported that M.W. lived with the family for a period of about one year, and during that time witnessed severe domestic violence between S.B. and mother, and S.B. and the other children.

{¶ 12} Sr.B., mother's adult daughter, testified next for LCCS. Sr.B. testified that she did not think M.W. should have custody of A.B. and X.B. Sr.B. testified that M.W. had a history of drug use, and had been a self-described crack addict. Although M.W. now appeared to be clean, Sr.B. testified that M.W. drank alcohol all day, beginning at 10:00 in the morning. Sr.B. described that M.W. was never violent or belligerent, but that she could just tell that M.W. had been drinking.

{¶ 13} In addition, Sr.B. testified that S.B. began sexually assaulting her when she was 13 years old, and continued to do so until she left the house at age 17. Sr.B. explained that one time, mother and S.B. got into an argument and mother called S.B. "a child molester." When M.W. asked why mother would call S.B. a child molester, Sr.B. interjected that it was because S.B. was molesting her, to which M.W. replied "Well, my son loves you." M.W. did not do anything to intervene or stop the abuse. Sr.B. testified that she does not believe that A.B. and X.B. should be around S.B., and she is afraid that M.W. would facilitate that relationship.

5.

{¶ 14} The final witness called by LCCS in its case-in-chief was Rebecca Theis, the ongoing caseworker. Theis testified that S.B. was serving a prison term of life with the possibility of parole after ten years for raping Sh.B., and that mother was serving a prison term of 30 months for felony child endangerment. Mother is scheduled to be released from prison in September 2021. Theis commented that both S.B. and mother were convicted following plea agreements.

{¶ 15} Theis also testified regarding a home study that she completed and denied for M.W. Theis stated that M.W. had a history of crack addiction, and that she did not become clean until 2005 when she was convicted of felony theft and sentenced to serve eight or nine months in prison. M.W. also had a history of alcohol abuse, reportedly beginning at a very young age. Theis testified that M.W. tested positive for alcohol during the home study.

{¶ 16} M.W. also had a history of involvement with LCCS where there were concerns that one of M.W.'s sons had raped one of her other sons. There were also concerns that M.W. was the perpetrator of physical abuse. Documentation from that time indicates that LCCS was unable to engage M.W. in services successfully. According to Theis, one of M.W.'s children emancipated from LCCS, and another one of her children, S.B., was incarcerated as a juvenile until he became an adult.

{¶ 17} As a final reason why the home study was denied, Theis testified that she was concerned M.W. would continue to foster a relationship between the children and mother and S.B. Theis stated that M.W. facilitates contact between mother and S.B.

6.

through jail house phone calls, and that she is constantly giving money to S.B. and giving money to his girlfriends even though she is on a fixed income. Furthermore, Theis was concerned that M.W. would be unable to protect the children from future abuse, given that she was aware of the abuse that had been occurring and did not report it to the police or LCCS, or do anything else to stop it from happening.

{¶ 18} Finally, Theis testified regarding the children. Theis testified that S.P. has a cousin in Virginia that is interested in adopting her. The cousin has been very proactive in doing the things necessary to help S.P. succeed, and has been approved by an interstate home study. As to A.B., Theis testified that he has significant global delays caused by autism and Cornelius de Lange Syndrome. Although he was eight years old, he did not speak, he was not potty trained, he did not know how to sleep and would only sleep one hour a day, and he still ate out of a bottle. Theis testified that A.B.'s foster parent has done tremendous work with him, but there is still much work to go. As to X.B., Theis testified that he was a great kid and full of energy, but that he could be a handful. She stated that X.B. appears to have a good relationship with M.W., and it appears that M.W. loves her grandkids, but Theis observed that M.W. does not really have a parental role in the relationship. Ultimately, Theis testified that it was her belief that it was in the best interest of the children to award permanent custody to LCCS.

{¶ 19} Following Theis's testimony, LCCS rested. M.W. then called witnesses on her behalf. The first witness to testify for M.W. was Lavonda Cohen. Cohen testified that she has known M.W. for six or seven years through church. Cohen testified that

7.

M.W. is a good grandmother, that she cares for A.B. and X.B., and that she responds to them appropriately. Cohen stated that she trusted M.W. with her own grandkids, and she did not see any reason why M.W. would not be a good placement for the children.

{¶ 20} Theresa Phillips next testified for M.W. Phillips also knows M.W. from church. Phillips described M.W. as loving, kind, and compassionate. Phillips testified that M.W. seems well-bonded with A.B. and X.B., and the children love being with her. Phillips also testified that M.W. is protective of the children, and that she believes M.W. will provide a loving, safe, and nurturing home for them.

{¶ 21} M.W. then testified on her own behalf. M.W. denied knowing that sexual abuse was occurring at her son's house. In addition, M.W. testified that now that she has heard about the things that have happened, she would not allow the children to have a relationship with mother or S.B.

{¶ 22} M.W. also testified that she has not used cocaine in 19 years, and that she no longer uses alcohol after she tested positive during the home study. M.W. stated that she has completed drug and alcohol treatment, and presented a certificate proving the same.

{¶ 23} As to the children, M.W. testified that she has a great relationship with them, and is very well-bonded with them. M.W. fully believes that she is capable of caring for the children and meeting their needs. She also noted that X.B. does not have emotional outbursts or destroy things when he is with her.

8.

{¶ 24} The final person to testify was the guardian ad litem. The guardian ad litem testified that based upon her investigation, her recommendation is that the court award permanent custody of the children to LCCS. The guardian ad litem noted the positive potential placement for S.P. with relatives in Virginia, the possibility that A.B. may be adopted by the foster family that he has been with throughout the case, and X.B.'s recent placement with a therapeutic foster family that may be better suited for his needs.

{¶ 25} The guardian ad litem also addressed M.W.'s desire for legal custody of A.B. and X.B. The guardian ad litem believed that placement with M.W. would not be in the children's best interest because of the special needs of the children. She stated that the children individually have been challenging for their foster parents, and she could not imagine the difficulty of having both children in the same home with only one caretaker. The guardian ad litem also had concerns about how much M.W. knew about the ongoing abuse, and the fact that M.W. did nothing to stop it. The guardian ad litem remarked that it was concerning that M.W. appeared to realize for the first time at the hearing that S.B. did bad things, when those facts have been known since S.B. went to jail over a year ago. Furthermore, the guardian ad litem was concerned by the fact that M.W., a recovering crack addict, was using alcohol during the case. Finally, the guardian ad litem was concerned that M.W. did not appear to remember that Children Services was involved with her own children when she was a parent, or that her children were placed into foster care.

9.

{¶ 26} Following the hearing, the trial court entered its judgment on July 21, 2020, granting LCCS's motion for permanent custody, and denying M.W.'s motion for legal custody of A.B. and X.B. The trial court found that the children could not be placed with either parent within a reasonable time or should not be placed with either parent. Relative to mother, the trial court found that R.C. 2151.414(E)(1) (failure to substantially remedy the conditions causing the child to be placed outside of the home), (E)(4) (lack of commitment toward the child), (E)(5) (incarceration for an offense committed against a sibling of the child), (E)(7)(c) (conviction for endangering children by torture or cruel abuse), and (E)(12) (parent incarcerated and not available to care for the child for at least 18 months) applied.

{¶ 27} The trial court then considered the factors under R.C. 2151.414(D)(1)(a)-(e), and determined that it was in the best interests of S.P., A.B., and X.B. to award permanent custody to LCCS. The court commented on the children's need for a secure, permanent placement, and that the children's parents remain incarcerated and unable to care for them. Further, the court found troubling that M.W. knew of the physical abuse and neglect yet failed to do anything to protect the children. The court also noted the fact that M.W.'s home study was denied, highlighting M.W.'s own significant history with LCCS, her history of cocaine use, her use of alcohol during the case, and M.W.'s personal history of trauma that included seeing her mother kill her father when she was almost three years old and being raped by her brother.

10.

**{¶ 28}** The court found that although the children may not be adopted together, and although X.B. has expressed a desire to reside with M.W., those considerations are outweighed by the need to protect the children from further neglect or harm. In addition, the court found that M.W. does not appear to fully appreciate the special needs of the children, and that she could not meet those needs.

**{¶ 29}** Therefore, the trial court awarded permanent custody of S.P., A.B., and X.B. to LCCS, thereby terminating mother's parental rights.[2]

## II. Assignments of Error

**{¶ 30}** Mother has timely appealed the trial court's July 21, 2020 judgment, and now asserts two assignments of error for our review:

> 1. The trial court's decision was against the manifest weight of the evidence as it was not in the best interest of the child to grant permanent custody of the child A.B. and [X.B.] to Lucas County Children Services and to deny the legal custody motions of [M.W.].

> 2. The court denied appellant's due process rights when it denied her request for a continuance so that she could appear at the permanent custody trial.

---

[2] The trial court also terminated the parental rights of fathers Se.P. and S.B.

11.

### III. Analysis

{¶ 31} In her first assignment of error, mother challenges the trial court's award of permanent custody of S.P., A.B., and X.B. to LCCS.

{¶ 32} In order to terminate parental rights and award permanent custody of a child to a public services agency under R.C. 2151.414, the juvenile court must find, by clear and convincing evidence, two things: (1) that one of the enumerated factors in R.C. 2151.414(B)(1)(a)-(e) apply, and (2) that permanent custody is in the best interests of the child. R.C. 2151.414(B)(1). Clear and convincing evidence is that which is sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. The clear and convincing standard requires more than a preponderance of the evidence, but it does not require proof beyond a reasonable doubt. *Id.*

{¶ 33} "A trial court's determination in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence." *In re A.H.*, 6th Dist. Lucas No. L-11-1057, 2011-Ohio-4857, ¶ 11, citing *In re Andy-Jones*, 10th Dist. Franklin Nos. 03AP-1167, 03AP-1231, 2004-Ohio-3312, ¶ 28. We recognize that, as the trier of fact, the trial court is in the best position to weigh the evidence and evaluate the testimony. *Id.*, citing *In re Brown*, 98 Ohio App.3d 337, 342, 648 N.E.2d 576 (3d Dist.1994). Thus, "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being

12.

against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus.

{¶ 34} R.C. 2151.414(B)(1)(a) provides that a trial court may grant permanent custody of a child to the agency if it finds that, in addition to the placement being in the best interest of the child,

> The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, * * * and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

R.C. 2151.414(E) requires a trial court to find that a child cannot be placed with either of the child's parents within a reasonable time or should not be placed with either parent if any of sixteen factors are met. Here, the trial court found that R.C. 2151.414(E)(1), (4), (5), (7)(c), and (12) applied to mother.

{¶ 35} Because only one factor is needed to support the trial court's conclusion under R.C. 2151.414(B)(1)(a), we will begin and end our analysis with R.C. 2151.414(E)(5). Notably, mother does not make any arguments relative to the specific factors found by the trial court under R.C. 2151.414(E).

13.

{¶ 36} The factor stated in R.C. 2151.414(E)(5) is "The parent is incarcerated for an offense committed against the child or a sibling of the child." Here, mother entered a plea of no contest to the charge of endangering children in violation of R.C. 2919.22(A), a felony of the third degree, for her role in failing to protect Sh.B. from the sexual abuse done by S.B. At the time of the hearing on the motion for permanent custody, mother was serving a 30-month prison sentence, and was not expected to be released until September 2021. Therefore, we hold that the trial court's determination under R.C. 2151.414(E)(5) is not against the manifest weight of the evidence.

{¶ 37} Turning to whether permanent custody was in the best interests of the children, R.C. 2151.414(D)(1) provides several factors that the trial court must consider in making its determination, including:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period * * *;

14.

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 38} In support of her assignment of error, mother argues that the trial court erred when it failed to place the children with M.W. LCCS argues that mother lacks standing to bring this argument, but we disagree.

A parent has standing to challenge the trial court's failure to grant a motion for legal custody filed by a non-parent because the court's denial of that motion led to a grant of permanent custody to the children services agency, which impacted the residual rights of the parent. * * * The parent has standing to challenge only how the court's decision impacted the parent's rights, however, not the rights of the third party. * * * In other words, Mother has no standing to assert that the court abused its discretion by failing to grant her friend legal custody of [the child]. Her challenge is limited to whether the court's decision to terminate her parental rights was proper.

(Internal quotations omitted.) *In re A.B.*, 6th Dist. Lucas Nos. L-12-1069, L-12-1081, 2012-Ohio-4632, ¶ 28-29, citing *In re J.J.*, 9th Dist. Summit No. 21226, 2002-Ohio-7330, ¶ 36.

15.

{¶ 39} Mother argues that placement with M.W. would have been a proper, less-restrictive placement than an award of permanent custody to the agency. She contends that M.W. was unaware of the physical and sexual abuse that was occurring in the family home. Further, mother asserts that M.W. promised to take the children to any medical or therapy appointments, that she would be able to financially support the children, and that she loves the children and would keep them safe. Mother notes that M.W. has never been charged with any criminal actions as it relates to her children or grandchildren, and that she has completed the drug and alcohol classes recommended by LCCS. Finally, mother argues that M.W. was visiting the children regularly, and that X.B. expressed his desire to live with M.W.

{¶ 40} In determining that the children were in need of a legally secure, permanent placement that could only be achieved by awarding permanent custody to the agency, the trial court found that M.W. knew of the physical and sexual abuse yet failed to do anything. The court also found troubling that M.W. used alcohol during the case, and had to complete alcohol services. Moreover, the court noted that M.W.'s home study was denied due to concerns over her prior involvement with LCCS, her history of substance abuse, and her own history of trauma. All of these facts, except for M.W.'s knowledge of the physical and sexual abuse, are undisputed. As to M.W.'s knowledge, we find that Sr.B.'s testimony, as well as the testimony of Theis, the counselors, and the guardian ad litem, all support the trial court's conclusion that M.W. knew of the abuse yet failed to act to protect the children.

16.

{¶ 41} In addition, the trial court found that maintaining relationships with the parents would not be in the children's best interest, and although the children may not be adopted together, that is a better alternative than the possibility that the children would be exposed to further neglect or harm. That possibility is supported by the evidence that M.W. continues to facilitate a relationship between her son, S.B., and mother. Despite M.W.'s statements to the contrary, her conduct suggests that she may attempt to facilitate a relationship between the parents and the children.

{¶ 42} The court also found that the current placement of the children better meets their needs than would placement with M.W., who the court found did not fully appreciate and would not be able to meet the intensive needs of the children. In consideration of the behaviors of A.B. and X.B., each of whom have individually been challenging for foster parents, we find that the trial court's determination that M.W. could not adequately care for them by herself is supported by the record.

{¶ 43} In sum, the trial court properly considered all of the factors in R.C. 2151.414(D)(1), relying on factual findings that were supported by the evidence in the record. Therefore, we hold that the trial court's finding that permanent custody was in the best interests of the children was not against the manifest weight of the evidence.

{¶ 44} Accordingly, mother's first assignment of error is not well-taken.

{¶ 45} In her second assignment of error, mother argues that the trial court violated her Due Process rights when it denied her request for a continuance so that she could be present at the permanent custody hearing.

17.

**{¶ 46}** "It is well-settled that a trial court has discretion to decide whether to proceed with a permanent custody hearing without having an incarcerated parent conveyed." *In re E.C.*, 6th Dist. Wood No. WD-12-033, 2013-Ohio-617, ¶ 14, citing *State ex rel. Vanderlaan v. Pollex*, 96 Ohio App.3d 235, 236, 644 N.E.2d 1073 (6th Dist.1994). "Accordingly, we will not reverse that decision absent an abuse of discretion." *Id.* An abuse of discretion connotes that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

> An individual does not have an absolute right to be present in a civil case to which she is a party. * * * We also note, however, that an individual has a basic, fundamental, and essential civil right to raise his or her own children. * * * Because of the competing interests involved in proceedings such as these, Ohio courts have applied a balancing test to determine whether a parent's due process rights were violated when the court proceeds with a hearing on a permanent custody motion without a parent's presence. Specifically, a court should balance the following factors: (1) the private interest affected, (2) the risk of erroneous deprivation and the probable value of additional safeguards, and (3) the governmental burden of additional procedural safeguards. * * * We previously approved of the

18.

Ninth District's reasoning in a case construing these factors. According to the Ninth District, a parent's due process rights are not violated when: (1) the parent is represented at the hearing by counsel, (2) a full record of the hearing is made, and (3) any testimony that the parent wishes to present could be presented by deposition.

(Internal citations omitted.) *In re E.C.* at ¶ 15.

{¶ 47} Here, mother was represented by counsel at the hearing, and counsel participated in the proceedings and cross-examined witnesses. In addition, a full record of the hearing was made. Finally, mother has not made any argument as to what evidence or testimony she would have presented if she were present. Indeed, the focus of the hearing was not on mother's ability to raise and care for the children, but rather on whether M.W. could provide a legally secure, permanent placement for them. Given that many of the trial court's reasons for finding that M.W. could not provide such a placement were based on undisputed facts, mother fails to demonstrate that her rights were prejudiced by her absence. Therefore, we hold that mother's right to due process was not violated by the trial court's failure to convey her to court for the permanent custody hearing.

{¶ 48} Accordingly, mother's second assignment of error is not well-taken.

19.

## IV. Conclusion

**{¶ 49}** For the foregoing reasons, we find that substantial justice has been done the party complaining, and the judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Mother is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

Christine E. Mayle, J.

Gene A. Zmuda, P.J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions. Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.